Randall WYKOFF, Plaintiff,

v.

Jan RESIG, Director of Westville Work Release Center; Gordon Faulkner, Commissioner of Indiana Department of Correction; Cloid Shuler, Deputy Commissioner of Operations for Indiana Department of Correction, Defendants.

No. S 84–713.

United States District Court, N.D. Indiana, South Bend Division.

July 30, 1985.

Rick C. Gikas, Merrillville, Ind., for plaintiff.

Kermit R. Hilles, Deputy Indiana Atty. Gen., Indianapolis, Ind., for defendants.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

The plaintiff, Randall Wykoff, former prisoner at the Westville Work Release Center (WWRC) presently incarcerated at

Westville Correctional Center (WCC), brought this action against defendants, Janice Resig, Director of the WWRC, Gordon Faulkner, Commissioner of the Indiana Department of Correction (DOC), and Cloid Shuler, Deputy Commissioner of Operations for the Indiana DOC, claiming that his rights have been violated under 42 U.S.C. § 1983. Plaintiff alleges that his Fourth, Fifth, Sixth and Fourteenth Amendments of the Constitution of the United States have been violated.

Jurisdiction here is founded upon 28 U.S.C. §§ 1331 and 1343(3) and (4). This court has conducted extensive evidentiary proceedings in this case: February 8, 1985 in South Bend, Indiana, May 3, 1985 in South Bend, May 24, 1985 at WCC, June 13, 1985 in South Bend, and concluding on June 20, 1985 in South Bend. This shall constitute the necessary findings and conclusions under Federal Rules of Civil Procedure 52 and 65. Plaintiff was very ably represented by counsel at all proceedings.

The reasons for plaintiff's alleged deprivation arose on two separate occasions: August 22, 1984 and November 8, 1984. Both incidents stem from plaintiff's alleged use of marijuana.

## I.

Plaintiff was transferred to WWRC from Summit Farm Work Release Center in early August 1984. He was employed by Cam Or Oil Company of Westville, Indiana. On August 22, 1984 plaintiff submitted to the EMIT[1] d.a.u Cannabinoid Assay test. Plaintiff alleges that one Sgt. Fleming told him that if his urine test came back positive, he would not lose his Regulated Community Assignment (RCA), his time class, and would probably only lose 30–60 days of good time. Sgt. Fleming denies making this statement. The screening officer, Officer Howard, then informed plaintiff that his urine sample had produced a positive result showing the presence of marijuana in his system. Plaintiff alleges that Officer Howard then confirmed what Sgt.

Fleming had told him concerning his sanctions. Officer Howard also denies having made such a statement. Officer Howard testified that he would not have authority to negotiate a plea bargain for this type of offense. Based on these alleged assurances that he would not lose this RCA, time class, or more than 60 days good time, plaintiff entered a plea of guilty before the CAB on August 27, 1984. Plaintiff received a sentence of 90 days loss of good time credits, was demoted in Time Earning Class from Class I to Class II, and his RCA eligibility was cancelled for September 25, 1984. Plaintiff timely appealed the sentence imposed upon him to all available stages of the DOC. The appeals were denied at each step of the DOC's appeals process.

On October 26, 1984, plaintiff filed an Emergency Petition for Writ of Habeas Corpus in the LaPorte County Superior Court, Cause Number S 2–84–6340. The petition challenged the constitutionality of various procedures used by the WWRC and the CAB in cancelling plaintiff's scheduled release from incarceration pursuant to the terms of his RCA release date. Until this time, plaintiff had not specifically stated that Officer Howard had made any statements to him concerning the sanctions he received from the CAB. However, central to this habeas corpus action was the challenge to the validity and constitutionality of imposing sanctions based on the sole EMIT test conducted by Pat Stayback of the LaPorte County Sheriff's department.

On November 8, 1984, plaintiff was ordered to submit to a second urine drop, as were several other residents of WWRC. The reason the WWRC officials ordered the drop was because an unnamed informant had accused plaintiff, among others, of using marijuana. However, no written statement had been placed in plaintiff's file wherein an informant was said to have seen plaintiff using marijuana.

---

1. EMIT stands for Enzyme Multiple Immune Assay Technique. It is manufactured by Syva Corporation in Palo Alto, California.

After plaintiff submitted to the urine drop, the facts are contested as to the actions and reactions of the plaintiff. Defendants contend that WWRC staff members observed plaintiff as being nervous and agitated. Sgt. McKinley, who was shift supervisor the evening of November 8, 1984, spoke to plaintiff concerning his behavior. Plaintiff allegedly told her that he had smoked some "stuff" earlier in the week and he was afraid it would show up in his urine test. Plaintiff then allegedly packed his belongings and told Sgt. McKinley that the reason he was doing so was because he knew that his urine was for sure dirty and he was just preparing to be sent to WCC for lockup. Worried that plaintiff might try to escape or harm himself or others, Sgt. McKinley called defendant Jan Resig, Director of WWRC, and informed her of the situation. Resig ordered that plaintiff be sent to WCC for his own safety and for the security of the WWRC. Plaintiff contends that he was not packing his clothes, but that clothes were strewn about his room that evening because his roommate was doing the laundry. He claims that this gave the appearance that he was packing his clothes. Furthermore, plaintiff denies making a statement to Sgt. McKinley concerning his smoking marijuana. Plaintiff refused to sign Sgt. McKinley's statement that contained his alleged statements concerning his use of marijuana.

Plaintiff is also challenging the way in which the urine sample was handled and its chain of custody. Three to four hours elapsed from the time plaintiff gave his urine drop until the sample was transported to the LaPorte County Sheriff's Department and locked in a refrigerator. All those who handled the urine sample in the chain of custody testified that they did not tamper with plaintiff's urine sample or any other urine sample which accompanied plaintiff's urine sample.

Pat Stayback of the LaPorte County Sheriff's Department tested plaintiff's urine sample using the EMIT d.a.u Cannabinoid Assay test on November 9, 1984. Plaintiff's urine sample was tested positive. The results of the EMIT test was not con-firmed by any other scientific testing technique until after the initiation of the present action. (On February 28, 1985 plaintiff's urine sample from November 8, 1984 was confirmed as positive by the Thin Layer Chromatography (TLC) method).

Based upon the results of the unconfirmed EMIT test, a conduct charge was brought against plaintiff. Plaintiff pled innocent to the charge of using marijuana. On November 13, 1984, plaintiff appeared before the CAB and was found guilty of the aforementioned charge. The CAB's finding of guilt was based upon the unconfirmed result of the EMIT test. Plaintiff received a sentence of ninety days; loss of good time credits; was demoted from Time Earning Class II to Time Earning Class III; and was removed from work release.

As a result of these last sanctions being placed on plaintiff, he has filed this action. Plaintiff suggests that defendants initiated the November urine test in retaliation for him petitioning the LaPorte County Superior Court for a Writ of Habeas Corpus.

Plaintiff's claim is based upon two issues: (1) as to the August incident, whether an inmate who enters a plea of guilty to an institutional charge based upon a staff member's promises as to the sentence he will receive has made a voluntary, knowing and intelligent waiver of his constitutional rights; and (2) what procedural due process must be attendant upon an institutional CAB's use of the results of the EMIT d.a.u Cannabinoid Assay test; i.e. (a) whether positive EMIT results must be confirmed by alternative scientific methods before such results can be used in a CAB hearing to impose disciplinary sanctions against prisoners, and (b) whether the chain of custody of plaintiff's urine sample was adequate.

## II.

### The August Guilty Plea

Plaintiff contends that before an individual may be said to have relinquished a constitutional right, there must be a knowing, intelligent and voluntary waiver of

that right. *Brewer v. Williams,* 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977). A guilty plea that would waive these rights is neither knowing, intelligent nor voluntary if it is "induced by threats (or promises to discontinue improper harassment), misrepresentation (including unfulfilled or unfulfillable promises), or perhaps by promises that are by their nature improper or having no proper relationship to the prosecutor's business (e.g. bribes)." *Marby v. Johnson,* — U.S. —, 104 S.Ct. 2543, 2547, 81 L.Ed.2d 437 (1984).

Plaintiff alleges that Officer Howard, the screening officer, made specific promises to him if he would plead guilty, allegations which Howard denies. However, plaintiff has not produced any other evidence or testimony rather than his own testimony showing that a promise was made to him for his plea of guilty. The Notice of Disciplinary Hearing which was completed by Officer Howard and signed by plaintiff contains no hint of a plea bargain agreement on sentencing recommendation. The Disciplinary Hearing Report made out by Douglas Huybart, the counselor who sat as the CAB hearing officer in plaintiff's case, and signed by plaintiff does not contain any reference to an asserted plea bargain or any promise by Officer Howard. The written appeal by plaintiff does not assert that there was plea arrangement or any promise made by Officer Howard upon which plaintiff relied. The one document which plaintiff contends supports his contention is a letter from himself to defendant Jan Resig in which plaintiff states:

> I came from Summit Farm dirty and hadn't been here 8 days when I was asked to give a urine drop. Of course it showed up on the test positive and I was told if I pled guilty that they wouldn't take my RCA away from me.

In this statement, plaintiff did not specify who "they" were. Officer Howard was not mentioned. He also failed to mention anything else that was allegedly included in the plea arrangement; (i.e. good time or demotion from Time Earning Class I to Time Earning Class II). Not until plaintiff petitioned the LaPorte County Superior Court on October 26, 1984, for a Writ of Habeas Corpus did he specifically state that Officer Howard made any sort of statement to him concerning a plea arrangement, a lapse of nearly two months since plaintiff pled guilty. This court had the opportunity to see and hear plaintiff in court and has reservations regarding his credibility on this issue.

█ Based on the evidence before this court, the court finds that plaintiff's guilty plea was unsolicited. This court also notes that the EMIT test ran on plaintiff's urine sample resulted in a positive reading, indicating plaintiff's use of marijuana. Thus, the positive EMIT result merely affirms plaintiff's guilty plea. Or, considering this evidence conversely, the plaintiff's unsolicited and uncoerced guilty plea adequately confirms the positive EMIT result. Therefore, the constitutionality of the alleged plea bargain is not in question since this court finds that no plea bargain was in fact struck between plaintiff and Officer Howard.

### III.

### Procedural Due Process Requirement

#### A.

#### Reliability of EMIT Test

Plaintiff contends that his due process rights were violated when the CAB imposed disciplinary sanctions on him based on the unconfirmed positive EMIT result. Both of plaintiff's expert witnesses agreed that a single unconfirmed EMIT test is not adequate evidence for the showing of drug use. Dr. Michael Caplia, Director and founder of the Great Lakes Forensic Laboratories, Inc., of Hobart, Indiana, testified that the scientific community world would not recognize the EMIT test as a reliable one-shot test. Dr. Caplis concluded that a decision based on one EMIT test is not "beyond a reasonable doubt" evidence that a drug is present. Plaintiff's second expert witness, Carsten Falkenberg, a toxicologist who is an application chemist for Hewlett Packard in Downers Grove, Illinois, also testified that the EMIT test should be con-

firmed by an alternative method. Falkenberg stated that using the EMIT test is a way to screen urine sample quickly and efficiently; that it was never meant to be final; and that it is a way to get rid of negatives. The manufacturers of the EMIT system, Syva Corporation, recommends that all positive EMIT results be confirmed where a greater degree of certainty is required. The Federal Bureau of Prisons also requires that positive urine tests be "validated to substantiate the positive result." 28 C.F.R. § 550.30 (1984).

One of the defendant's expert witnesses, Dr. Gerrit E.D. Schut, Laboratory Manager and General Supervisor of Toxicology Laboratory Center, Inc., of Lansing, Michigan, testified that EMIT testing is good enough for one-time testing. Dr. Schut stated that EMIT testing in his laboratory has been accurate. However, Dr. Schut's lab confirms its positive EMIT results by alternative scientific methods.

A prisoner's due process interests can only be deprived from him in accordance with *Woff v. McDonnell*,[2] 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *Stringer v. Rowe*, 616 F.2d 993 (7th Cir.1980). But the very nature of lawful incarceration "brings about the necessary withdrawal or limitations of many privileges and rights." *Pell v. Procunier*, 417 U.S. 817, 822, 94 S.Ct. 2800, 2804, 41 L.Ed.2d 495 (1974). Thus, the question arises: is due process satisfied when sanctions are imposed on prisoners based on an unconfirmed EMIT test?

This issue has been addressed by several state and federal courts. In *Smith v. State*, 250 Ga. 438, 298 S.E.2d 482 (1983), the plaintiff's probation was revoked and the plaintiff incarcerated on the basis of an unconfirmed EMIT test. The Supreme Court of Georgia merely found that the evidence supported the determination that the device used to detect the presence of cannabinoids in one's system was reliable and that the results of a urinalysis based

on such a device were admissible. *Id.* In a more recent Georgia case, *Hunt v. State*, 173 Ga.App. 638, 327 S.E.2d 500 (1985), appellant's probation was revoked after the EMIT test returned positive. When the probation revocation hearing began, some six weeks following the results of the unconfirmed EMIT test, appellant submitted to the court a handwritten motion for a continuance on the ground that he wished to have an independent expert evaluate the test results. The Dougherty County Superior Court denied the motion and revoked the probation, and the Court of Appeals of Georgia affirmed holding that the failure of an individual to file a timely motion to obtain independent analysis showed sufficient lack of due diligence to support denial of continuance. *Id.* 327 S.E.2d at 501. This court notes that the two Georgia courts did not discuss the constitutional implication of sanctions imposed on the basis of the unconfirmed EMIT results.

Two state level courts have found single unconfirmed EMIT tests as unreliable. In *Kane v. Fair*, 33 Cr.L. 2492 (Mass.Superior Ct., August 5, 1983), the plaintiffs did not seek an injunction based solely on the single EMIT testing of marijuana, but they sought an injunction on the use of unconfirmed EMIT results on drugs in general. The court held that no positive EMIT test result may be introduced as evidence in any disciplinary hearing unless accompanied by evidence that the positive result was confirmed by an alternative method of analysis; and no sanction may be imposed on account of any previously conducted Disciplinary Board findings based up unconfirmed EMIT test result. The *Kane* court seemed to apply the standard defined in *Frye v. United States*, 293 F. 1013 (D.C. Cir.1923), when it stated:

> No evidence having been introduced that warrants my finding that EMIT has been generally accepted by toxicologists and/or pharmacologists as producing a

---

**2.** Recent Seventh Circuit cases also indicate that prisoners must be accorded minimum due process procedures. See *Hanrahan v. Lane*, 747 F.2d 1137 (7th Cir.1984), where an inmate filed a section 1983 action challenging prison disciplinary actions taken against him, and *Soto v. Dickey*, 744 F.2d 1260 (7th Cir.1984), where the use of mace against inmates was upheld when reasonably necessary.

reliable positive result *in the absence of independent confirmation,* I find that it does not produce such a result absent such confirmation. (emphasis added).

*Kane v. Fair, supra,* at 4. However, the Supreme Court of the United States in *Wolff v. McDonnell, supra,* declined to mandate the full panoply of rights to prisoners which are accorded a defendant in a criminal action.

In *Johnson v. Walton,* No. 561–84 Rm. (Rutland Superior Court, Vermont, Feb. 14, 1985), the Vermont court held that an EMIT test used alone was not scientifically reliable. The court found that although the confirming method called mass-spectroscopy is 100% reliable and thus optimal, an EMIT test confirmed by a method called Thin Layer Chromatography (TLC) will indicate presence of a drug with scientific certainty that goes beyond a reasonable doubt. The court thus required the confirmation of an EMIT test by either mass-spectroscopy or TLC. The Vermont court further held that the chance of false positives in unconfirmed test results and the concomitant loss of liberty violates a prisoner's minimum fundamental fairness and due process rights.

The only federal court which has ruled on the merits of using an unconfirmed EMIT test for administrative punishment is the United States District Court for the District of North Dakota. *Jensen v. Lick,* 589 F.Supp. 35 (D.N.D.1984). The court in *Jensen* held that the prison officials could impose sanctions on prisoners based upon the unconfirmed EMIT test. The court based its decision on the fact that the Center for Disease Control in Atlanta, Georgia, tested the reliability of the EMIT testing procedures and found them to be 97 to 99% accurate, and also because the material furnished by the plaintiff established that the test can be relied upon with 95% confidence in the accuracy of the test result; and that is tantamount to almost complete certainty. *Id.* at 38 and 39. The plaintiff in *Jensen,* however, challenged the urine screening program as a whole. The plaintiff did not submit to the urine test and has never received an inaccurate test result. The sanctions imposed upon the plaintiff were imposed upon him because of his failure to obey an order to take the urine test. Plaintiff was not actually injured as the result of an unconfirmed EMIT test.

In a similar district court case, the court refused to issue a preliminary injunction on the use of a single EMIT test since none of the plaintiffs had been disciplined because of the positive results. *Storms v. Coughlin,* 600 F.Supp. 1214 (S.D.N.Y.1984). The plaintiffs asserted that the possibility they would be disciplined solely on the basis of an unconfirmed EMIT test violated their constitutional rights to due process. Judge Haight, who authored the opinion, did not determine the merits of the case or the reliability of the EMIT test, but did state this:

I have previously adverted to the plaintiff's charge that the EMIT test results are unreliable. Point I at 1221–1222, *supra.* I reiterate that the issue poses a substantial question. It must be remembered that these tests are random; they are done with no reason to think that the particular inmate is using drugs. The EMIT results are thus ordinarily the sole ground for discipline. The question would not be so close if the prisoners were tested only after exhibiting behavior or an appearance consistent with drug use or after having been found to possess drugs. The two facts together— conduct or possession plus positive drug results—would persuasively indicate drug use. Without the supporting evidence of behavior, however, unreliable (assuming that they are) test results seem a much weaker reed on which to premise disciplinary action. Officer Brady testified that the prison requires any sample which tests positive to be retested by another officer. While this precaution will correct for human error in the testing process, it will not affect machine-generated error. Only testing by a different method can do that. This course is made impossible by the prison's practice of disposing of the urine sample after testing, thus denying those prisoners who wish to obtain an independent

test the opportunity to do so. This practice too is troublesome. *Id.* at 1225. Judge Haight indeed questions the reliability of the solo EMIT test and the disposal of the urine sample after testing. He did state however that "conduct or possession plus positive drug results would persuasively indicate drug use." *Id.* The court in *Jensen v. Lick, supra,* also indicated that EMIT test results could be bolstered by confirmation tests, where that was necessary, or by discovery of marijuana residue, paraphernalia, roaches, and roach clips. *Id.* at 39.

In a more recent district court decision from the Southern District of New York, the court denied injunctive relief to plaintiff prisoners where EMIT test results were confirmed by a second EMIT test. *Peranzo v. Coughlin,* 608 F.Supp. 1504 (S.D.N.Y.1985). The court held that:

> [T]he risk that double EMIT testing will result in erroneous deprivation of an inmate's liberty interests has not been shown to be so significant that additional testing procedures can be required at this stage of the proceedings as a matter of due process, regardless of the incremental benefits that additional procedures might yield or the burdens which such procedures may impose.

*Id.* at 1514. In reaching its conclusion, the *Peranzo* court claimed that the decision of the Supreme Court in *California v. Trombetta,* — U.S. ——, 104 S.Ct. 2528, 81 L.Ed.2d 413 (1984), was an indication of the willingness of the legal system not to mandate procedures which will assure absolute scientific accuracy in determinations of criminal culpability. *Peranzo v. Coughlin, supra,* at 1508. The Court in *California v. Trombetta, supra,* held that the Due Process Clause of the Fourteenth Amendment does not require that law enforcement agencies preserve breath samples in order to introduce breath-analysis tests at trial. *Id.* 104 S.Ct. at 2535. The *Peranzo* court further interpreted the *Trombetta* decision as reflecting a general recognition that states need not implement all possible procedural safeguards against erroneous deprivation of liberty when utilizing results of scientific testing devices in accusatory proceedings, even though the Court did not directly address the reliability of the breath test under due process standards. *Peranzo v. Coughlin, supra,* at 1509.

In addition, the *Peranzo* court relied partially on numerical benchmarks assigned to the various standards of proof which govern judicial proceedings. These numerical benchmarks were defined in *United States v. Fatico,* 458 F.Supp. 388 (E.D.N.Y.1978), *aff'd,* 603 F.2d 1053 (2d Cir.1979), *cert. denied,* 444 U.S. 1073, 100 S.Ct. 1018, 62 L.Ed.2d 755 (1980), by Judge Weinstein:

> [T]he probabilities associated with the various standards of proof may be fairly estimated as 50+% for preponderance of the evidence, 70% for clear and convincing evidence, above 80% for clear, unequivocal and convincing evidence, and 95+% for evidence beyond a reasonable doubt. *Id.* at 403–06.

*Peranzo v. Coughlin, supra,* at 1512. The *Peranzo* court, using the evidence before it, found that the defendants' test procedures were analogous to the testing procedures used in the two studies with the largest sample sizes. Those two studies were performed by the Center for Disease Control, which found the rate of error for the EMIT test to be 4%, and the Substance Abuse Service Testing and Research Laboratory, which found the rate of error for the EMIT test to be 2.3%. The *Peranzo* court concluded that the rate of error of defendants in performing their double EMIT tests should also be between 2.3% and 4%. Therefore, the *Peranzo* court held that the defendants' EMIT test was 96% accurate and fit in the 95+% category for evidence "beyond a reasonable doubt" on the numerical benchmark scale established in *United States v. Fatico, supra.*

Across the Hudson River in New Jersey, the United States District Court for that district dismissed a case involving the reliability of an unconfirmed EMIT test on the condition that the positive test results be confirmed by an alternative method of analysis. *Denike v. Fauver,* No. 83–2737 (D.N.J.1983). The court ordered the dismissal of the case point blank. It did not

elaborate on whether the plaintiffs had been denied due process.

The most recent federal district court opinion involving the reliability of the EMIT test sustained a preliminary injunction against imposing sanctions on prisoners based on one unconfirmed EMIT test. *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky. 1985). In upholding the injunction the court found that the case law and the expert evidence at the hearing indicated a probability of success on the merits. *Id.* at 231. The court's decision was based upon the use of unconfirmed EMIT test as the sole evidence presented in a punitive action proceeding whether the proceeding is for an alleged violation of "intoxication" or "use of drugs." *Id.* at 232.

Considering the facts of the present case, the testimony of the expert witnesses, and considering this case in the light of all the aforementioned cases, this court would normally face a very difficult and delicate question as to the constitutionality of sanctions imposed upon prisoners based upon unconfirmed single EMIT tests. Based upon these unconfirmed results, the CAB found plaintiff guilty of using marijuana. The CAB revoked ninety days of plaintiff's good time, demoted plaintiff from Time Class II to Time Class III, and removed plaintiff from work-release status. However, the CAB's sanctions were well founded. On February 28, 1985, plaintiff's urine sample was transported by Pat Stayback to the State Department of Toxicology in order to be tested for marijuana. The type of test used to confirm the same was the TLC method. This test confirmed the positive EMIT result founded by Pat Stayback.

Plaintiff suggested that the TLC method of confirming positive EMIT results is inadequate. Plaintiff's two expert witnesses, Dr. Caplis and Carsten Falkenberg, testified that the best methods to confirm positive EMIT results are Gas Chromotagraphy and Bas Chromatography/Mass Spectroscopy. Plaintiff supplemented this testimony with the fact that Syva Corporation, manufacturers of the EMIT d.a.u. Cannabinoid Assay, does not recommend the TLC method as a method to be used to confirm positive EMIT tests. Plaintiff also stated that the TLC technique was not identified as an appropriate confirmation technique by the Center for Disease Control, the Department of Health and Human Services, or in an article entitled *Problems of Mass Urine Screening for Misused Drugs,* by John P. Morgan, M.D.; published in the Journal of Psychoactive Drugs, Vol. 16(4), Oct.-Dec. 1984.

Dr. Doedens, defendants' first expert witness, testified that he has never read anything that said the TLC method should not be used to check EMIT results. Defendants' second expert, Dr. Gerrit Schut, testified that the TLC method was accepted by the scientific community as an appropriate confirming technique. The court in *Johnson v. Walton, supra,* held that an EMIT test confirmed by the TLC method will indicate the presence of a drug with scientific certainty that goes beyond a reasonable doubt.

■ This court finds that the TLC method of confirming an EMIT test is sufficient. Even though Gas Chromatography or Gas Chromatography/Mass Spectroscopy might be the best methods with which to confirm an EMIT test, plaintiff has not shown that the TLC method of confirming positive EMIT results is inadequate or unreliable.

■ Since plaintiff's urine sample has been confirmed as positive by the TLC method, the EMIT test has been proven reliable in plaintiff's situation. However, in order to afford a prisoner appropriate due process in accordance with *Wolff v. McDonnell, supra,* this court holds that all positive EMIT results in the future should be confirmed by a second EMIT test or its equivalent.

### B.

### Chain of Custody of Urine Sample

■ It should be understood that the species of due process which applies to CAB proceedings, as announced in *Wolff v. McDonnell, supra,* is of a limited variety. However, minimum due process is important and must be followed by correctional

authorities when applicable. The *Wolff* standard certainly does not give a due process carte blanche to correctional officers. Neither does the *Wolff* minimum due process standard presume the absolute good faith and integrity of all correctional officers at all times under all circumstances. To the contrary, it requires certain procedural minimum and frames them in constitutional terms.

■ Correctional officers are explicitly authorized to take urine samples from inmates. This practice is a necessary one. The manner in which this sensitive process is accomplished must comport with the due process standard defined in *Wolff*. This court also notes that we are not here dealing with the "beyond a reasonable doubt" criminal standard defined in *Frye v. United States, supra.*

■ *Wolff* certainly requires that the handling and processing of such inmate samples be done in such a way as to insure the basic integrity of the system. An inmate has a legitimate liberty interest in this subject matter and has a right to expect minimal due process safeguards to insure that samples are not mishandled by correctional officers. Given the realities of the correctional setting, these procedures must be reasonably definite and must be fully and carefully documented at all stages. Such procedures serve the best interests of the correctional system as well as the limited due process rights of the inmate.

■ Plaintiff asserts that the chain of custody of his urine sample is inadequate since it is not documented. Direct testimony at the trial established the following chain of custody for plaintiff's urine sample: Officer Nelson handed an unmarked plastic bottle to plaintiff into which plaintiff urinated; plaintiff then handed the urine sample to Officer Nelson; Officer Nelson screwed the lid, which contained plaintiff's name and DOC number, onto the bottle; Officer Nelson returned the bottle to Post-1 where the lid was sealed with tape by Sgt. McKinley, who was shift supervisor that evening; Sgt. McKinley placed the sample into a box which was later filled with other inmates' urine samples; the urine samples were then placed inside of an unlocked refrigerator; nearly three hours later, Sgt. McKinley gave the urine samples to Officer Norman Tripp who was to transport the samples to the LaPorte County Sheriff's Department; upon arrival at the sheriff's department, Officer Tripp handed the urine samples to jailer Henriott; jailer Henriott then gave the samples to Officer Barbara Jean Griffin; Officer Griffin took the urine samples to the fourth floor medical office and placed the urine samples in a locked refrigerator; and finally, Pat Stayback arrived around 7:00 o'clock A.M. November 9, 1984, removed the urine samples to her laboratory, and tested the urine samples on the EMIT d.a.u Cannabinoid Assay.

Even though no written record exists as to the location of the plaintiff's urine sample at all times, the testimony at trial establishes the whereabouts of his sample from the moment it was taken until it was tested by Pat Stayback. The only moments in which the sample was not attended was when it was in Post-1 at WWRC and in the fourth floor medical office refrigerator at the LaPorte County Sheriff's Department. The only persons who had access to Post-1 were WWRC officials on duty that evening. Each of them testified that they did not tamper with plaintiff's urine sample or any other inmate's urine sample. Inmates are not allowed into Post-1 without an escort. Though the refrigerator was not locked, the door to Post-1 was always locked. The only persons who had access to the locked fourth floor medical room at the LaPorte County Sheriff's Department were department personnel. Not even the maintenance personnel or the janitors had access to the medical room. Those who handled the samples testified that they did not tamper with the plaintiff's sample or any other inmate's sample. The refrigerator was also kept locked.

After Pat Stayback tested plaintiff's urine sample and found that it was positive, she placed it in a locked freezer in her laboratory. She took the sample to the Indiana State Department of Toxicology in

Indianapolis on February 28, 1985. Stayback testified that the sample was not out of her sight during the entire trip to and from Indianapolis. She later turned the sample over to a man representing plaintiff's counsel.

Plaintiff insinuated that his sample may have been spiked or switched with a positive sample. This court believes otherwise. Plaintiff has introduced no evidence showing that someone had tampered with his urine sample. Also, plaintiff's reaction to taking the November 8, 1984 urine test, and his actions following the taking of the test seem to implicate him in the matter. Based on these reasons and the plaintiff's own credibility, this court holds the handling of plaintiff's urine sample was adequate, and that the disciplinary sanctions imposed upon plaintiff should not be disturbed here.

 However, this court, or for that matter, any court, does not have the time to hear complaints based on the inadequate chain of custody for prisoner's urine samples. While the defendants established an adequate chain of custody for plaintiff's urine sample in this particular case, their handling of the same is less than ideal. The Indiana DOC should seal urine samples in the presence of the inmate donor, keep a written record on the location and transportation of urine samples at all times, and while the samples are still in the possession of the DOC, it should store the urine samples in locked refrigerators with very limited access. Furthermore, the minimum due process requirements defined in *Wolff v. McDonnell, supra,* requires that inmates receive a duplicate copy of the EMIT test results from the laboratory which conducted such test.

On the basis of this record presented, there is no basis for damage or injunctive relief in favor of this plaintiff under 42 U.S.C. § 1983. Judgment shall enter accordingly.