**Willie F. CHANEY, Jr.,
Plaintiff–Appellant,**

v.

**SOUTHERN RAILWAY COMPANY,
Defendant–Appellee.**

No. 87–7436.

United States Court of Appeals,
Eleventh Circuit.

June 16, 1988.

---

Gordon, Silberman, Wiggins & Childs, Robert L. Wiggins, Jr., Ann K. Norton, Birmingham, Ala., for plaintiff-appellant.

Sydney F. Frazier, Jr., Cabaniss, Johnston, Gardner, Dumas & O'Neal, Birmingham, Ala., for defendant-appellee.

Before KRAVITCH, Circuit Judge, HENDERSON * and HENLEY **, Senior Circuit Judges.

KRAVITCH, Circuit Judge:

Willie F. Chaney was dismissed from employment by Southern Railway Company after a urinalysis indicated that he had used marijuana. Chaney brought this Title VII action claiming that he was discharged on the basis of his race, alleging theories of disparate impact and disparate treatment. At the conclusion of the plaintiff's evidence, the district court granted the defendant's Rule 41(b) motion,[1] entering judgment in favor of Southern Railway. Chaney has appealed. We affirm in part and reverse in part.

## I.

Chaney, a black man, was employed as a special agent by Southern Railway Company in its Police and Special Service Department. On March 8, 1984, Chaney's immediate supervisor, Lieutenant Presley, climbed the stairs to the tenth floor of Southern Railway's Transportation Building.[2] The tenth floor was vacant and had not been used by railway personnel for some time. When Presley entered the tenth floor hallway, he noticed the smell of smoke, which he first suspected to be burning rags or some other kind of fire. Tracing the odor to its source, he entered a vacant room and noticed that the door to that room's inner office was nearly closed, although he knew that it had been open earlier in the day. At this point, Presley recognized the smoke scent as marijuana. As Presley started to open the door, Chaney came out of the smoke-filled room. Presley asked Chaney what he had been burning, and Chaney replied that he had been smoking a cigarette. Chaney and Presley walked to the elevator and descended to the first floor. Presley testified that Chaney was nervous and talking at an accelerated pace, but that Chaney did not mention the marijuana smoke. Although Chaney lit a cigarette, Presley continued to notice the smell of marijuana. Chaney returned to his duties on the first floor and left at the end of his shift.

Presley took another supervisor to the tenth floor, but because the window had been left open, much of the smoke in the inner office was gone. Presley presented a written report of the incident to railway management the same day.

---

* See Rule 34–2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit.

** Honorable J. Smith Henley, Senior U.S. Circuit Judge for the Eighth Circuit, sitting by designation.

1. Fed.R.Civ.P. 41(b) provides in part:
   After the plaintiff, in an action tried by the court without a jury, has completed the presentation of evidence, the defendant, without waiving the right to offer evidence in the event the motion is not granted, may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief. The court as trier of the facts may then determine them and render judgment against the plaintiff or may decline to render any judgment until the close of all the evidence.

2. Presley, who wears a leg prosthesis, regularly climbs the stairs to the tenth floor as a form of exercise.

Chaney contends that it would have been physically impossible for him to have smoked a marijuana cigarette in the inside office before Presley discovered him there. Chaney asserts that he was sitting at his desk on the first floor when Presley started climbing the stairs to the tenth floor shortly before 4:00. After a few minutes. Chaney contends that he needed a cigarette break and wanted to check on logistics for a stakeout of the parking lot intended to curb vandalism. The parties agreed that Chaney did not leave his desk until sometime around 4:05. Chaney states that when he stepped out of the elevator onto the tenth floor, he smelled the odor of burning rags and went to look for its source. When he was in the room with the strongest stench, he ran into Presley. Chaney states that he then rode the elevator with Presley back to the first floor, helped another employee take a movie projector to the seventh floor, and washed his hands in the rest room, where Presley saw him at 4:15. Accordingly, Chaney contends that he could have been on the tenth floor no more than 60 seconds before he saw Presley. The district court, however, did not credit this testimony.

Although Chaney was off-duty the next day, he was summoned to the office to meet with Presley and Presley's supervisor, Chief Jim Wilson. When asked what he had been doing on the tenth floor, Chaney replied that he had "just been up there walking around and smoking." When asked if he had smelled anything burning, he responded, "you mean like a rug burning or marijuana?", although neither Presley nor Wilson had mentioned marijuana prior to that time. Chaney offered to undergo a drug test and, recognizing that Presley and Chaney had been the only two people on the tenth floor at the time of the incident, Wilson asked both of them to have their blood and urine tested for the presence of drugs. Both men agreed to be tested.

Both Chaney's and Presley's urine samples were analyzed by Med Lab in Birmingham. To test the samples, Med Lab em-

ployed an enzyme immunoassay, the EMIT Cannabinoid Urine Assay (EMIT test) manufactured by Syva Company. The urinalysis results indicated that Chaney was positive for marijuana use but Presley was not. Although Med Lab performed a second EMIT test on Chaney's sample, it did not use a different type of follow-up test to confirm Chaney's positive result. There is no evidence that either man's blood test indicated drug use.

Shortly after Southern Railway received the urinalysis results, Wilson called Chaney into his office. When told that the test indicated that he had used marijuana, Chaney asserted that a previously unreported incident could explain the result. He stated that about two or three weeks prior to the March 8 incident, while he was off-duty, he had visited a nightclub in Birmingham, where he was accosted by an individual he had encountered in a police investigation approximately two years before. The man thought he recognized Chaney as a police officer, and insisted that Chaney disprove that suspicion by smoking some marijuana cigarettes with him and his friends. Chaney explained that he took several "tokes" from two marijuana cigarettes in order to avoid compromising his identity as an undercover agent.

After this meeting, Southern Railway discharged Chaney. Chaney obtained a right-to-sue letter from the Equal Employment Opportunity Commission (EEOC) and filed this suit against Southern Railway, alleging that he was discharged on the basis of his race.

At trial, Chaney presented evidence that the EMIT test is unreliable and racially biased. Chaney's expert, Dr. Woodford, testified that the EMIT test is nonspecific and ideally used as an initial screening test because it serves as an indicator that fragments of THC,[3] the chemical which gives marijuana its intoxicating effect, could be in the urine, but does not directly measure or identify the presence of THC. He also testified that the scientific community, and the manufacturer of the test itself, recog-

---

**3.** Tetrahydrocannabinol.

nize that the EMIT test is not entirely reliable and that once a positive result is obtained, a follow-up test which specifically identifies the THC metabolites, such as a gas chromatography mass spectrometer test, should be used. He claimed that studies have shown that the EMIT test has about a twenty-five percent false negative and false positive rate, and that the false positive rate could be so high because normal body substances can mimic the THC metabolites and be picked up by the test.[4]

Dr. Woodford also testified that the EMIT test manufacturer does not warrant the test if performed on a urine sample over eight hours old, because of an "assay drift" that gradually results in a sample that, although containing no THC, nevertheless tests positive for THC. He opined that the fact that Chaney's sample was not tested for 75 hours could have had a "devastating" effect on the test, causing the result to be erroneous.

Dr. Woodford further testified that black people disproportionately obtain false positives for drug use on the EMIT test because they have higher levels of melanin, the substance responsible for dark skin tone, in their urine than do white people. According to Dr. Woodford, the EMIT test misreads melanin fragments as ingested THC fragments. Dr. Woodford further stated that alternative tests, such as the gas chromatography and GC–Mass Spec tests, do not have the EMIT test's racial impact.

After Chaney rested his case, the district court granted Southern Railway's motion under Fed.R.Civ.P. 41(b),[5] concluding that under the facts presented and the applicable law, Chaney had not stated grounds for relief. In granting judgment for Southern Railway, the trial court squarely outlined appellant's disparate treatment claim. The court found that although Chaney had stated a prima facie case of disparate treatment, Southern Railway articulated a valid nondiscriminatory reason for the discharge. Determining that Chaney had not shown that the articulated reason was a pretext for discrimination, the court concluded that Southern Railway had the right to dismiss Chaney.

In granting the Rule 41(b) motion, however, the district court did not thoroughly discuss Chaney's disparate impact claim. During appellant's argument in response to the Rule 41(b) motion, the court had stated that the disparate impact issue was not squarely presented in appellant's statement of position in the pretrial order. The statement of position read:

The plaintiff contends that he was discharged because of his race. White employees in similar circumstances were treated more leniently than the plaintiff. The plaintiff denie [sic] the validity of the test used to detect marijuana and denies he used marijuana. The plaintiff contends that the defendant discriminates generally against black employees in discipline and discharge situations.

Appellant argued to the district court that the first sentence in the statement, concerning racial discrimination, in addition to the third sentence, which specifically questioned the validity of the test, sufficiently presented the question of disparate impact, and that under the law of this circuit, he should be allowed to present both theories. Although the district court seemed to accept this argument, in granting judgment to Southern Railway the court gave short shrift to the disparate impact claim. It accepted the testimony of Chaney's expert that the test was invalid and unreliable "for a number of reasons," but held that

---

**4.** Chaney also introduced into the record copies of cases in which the EMIT test was found insufficiently reliable: *Jones v. McKenzie,* 628 F.Supp. 1500 (D.D.C.1986) (plaintiff entitled to summary judgment that her termination on the basis of a single unconfirmed EMIT test was arbitrary and capricious), *rev'd on other grounds,* 833 F.2d 335 (D.C.Cir.1987); *Pella v. Adams,* 638 F.Supp. 94 (D.Nev.1986) (substantial issue of material fact existed as to reliability of EMIT test, precluding summary judgment); *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky.1985) (enjoined corrections officers from taking disciplinary action against inmates solely on the basis of unconfirmed EMIT test results); *Wykoff v. Resig,* 613 F.Supp. 1504 (N.D.Ind.1985) (all positive EMIT results should be confirmed).

**5.** *See supra* note 1.

the fact of the test's invalidity was irrelevant "because by plaintiff's own admission, he had in fact used marijuana within two or three weeks of the time that the test was taken." The court concluded that the positive test result was due to Chaney's admitted use of marijuana, and provided no further discussion of the disparate impact theory.

As discussed below, we affirm the district court's conclusion that Southern Railway was entitled to judgment on Chaney's disparate treatment claim. We find, however, that appellant's disparate impact claim was fairly presented in his statement of position in the pretrial order, and that a remand is necessary in order to develop the disparate impact claim.

## II.

Proof of discriminatory motive or intent is essential for a plaintiff to prevail in a disparate treatment case. *Griffin v. Carlin*, 755 F.2d 1516, 1525 (11th Cir.1985) (citing *International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335–36 n. 15, 97 S.Ct. 1843, 1854–55 n. 15, 52 L.Ed.2d 396, 415–16 n. 15 (1977)). In a disparate treatment action, the plaintiff must first present a *prima facie* case of employment discrimination. The employer then has the burden of showing that legitimate, nondiscriminatory reasons existed to support its action. It is unnecessary that the defendant persuade the court that it was actually motivated by the proffered reasons; "[i]t is sufficient if the defendant raises a genuine issue of fact as to whether it discriminated." *Griffin*, 755 F.2d at 1526 (citing *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207, 216 (1981)). The burden then shifts back to the plaintiff to show that the employer's articulated reasons were a pretext for discrimination. *Griffin*, 755 F.2d at 1526.

In this case, the district court held that Chaney met the "not onerous" burden of establishing a prima facie case of racial discrimination by showing that Southern

Railway discovered that some white employees had possessed or used marijuana but did not discharge them. The court noted two instances in particular. In the first, three white trainmen employed by Southern Railway had been arrested while off-duty in Meridian, Mississippi, for possession of marijuana. The three men, performing such duties as brakeman, fireman, and flagman, had operated a Southern Railway train which arrived in Meridian, Mississippi at 7:10 p.m. on April 10, 1983. They were scheduled to stay overnight in Meridian and to be called at 5:40 a.m. the next day to operate a train on the return trip from Meridian to Birmingham. About 9:30 p.m. on the night they arrived in Meridian, they were stopped by a police officer who noticed that their automobile's license tag had expired,[6] and who believed the car to be operated in an unusual manner. According to Southern Railway's investigation report on the incident, after stopping the car, the police officer smelled a strong odor of marijuana and saw open cans of beer in the vehicle. On the passenger side of the car, the police officer found a plastic bag containing marijuana and two rolled joints of marijuana. He found a half-smoked joint of marijuana on the driver's side, and a roach clip and a ceramic pipe containing marijuana residue in one of the men's front pocket. The officer also reported that the men seemed to be intoxicated and did not care what happened to them. They were charged with possession of less than one ounce of marijuana (a misdemeanor) and arrested; the driver was also charged with having an improper license tag. They were released after posting bond and made the return trip to Birmingham, operating the 5:40 a.m. train. Southern Railway claims not to have learned of their arrests until after the men had returned to Birmingham and were off-duty, although Chaney contests this fact. All three men were counseled by a train department supervisor when they subsequently returned to work, but they were never requested to take drug tests or lie

---

**6.** One of the three men owned the automobile and had driven it to Meridian before April 10 in order to have access to a car while off-duty in Meridian.

detector tests regarding marijuana use, and they were not discharged.

The second incident discussed by the district court involved another white employee of the police department, Alice Buxton, who had admitted to using marijuana while she was off-duty. She was also not discharged nor asked to take a drug test.

Despite these two instances, which it found sufficient to state a *prima facie* case of disparate treatment, the district court determined that Southern Railway met its burden of persuasion by articulating a valid, nondiscriminatory reason for Chaney's discharge. Rule G of the railway's operating rules provides that "[a]n employee who uses a narcotic drug while on duty will be dismissed." The court concluded that it was unnecessary to determine whether or not Chaney in fact used marijuana on March 8 because the railway carried its burden of production merely by showing that it, in good faith, believed that Chaney used drugs while on duty that day. The court indicated that the railway's good faith belief was adequately supported by the following circumstances:

1). Chaney's otherwise unexplained presence on the tenth floor, as employees do not go to that floor simply to smoke.

2). Chaney's presence in the room where marijuana had been smoked for some time before being discovered by Presley.

3). Chaney's implausible excuse that he had been on the tenth floor simply to smoke a cigarette.

4). Chaney's uneasiness and nervousness upon being discovered by Presley.

5). Chaney's failure to mention the otherwise unexplained smoke which he claimed to have discovered when he arrived on the tenth floor, but did not report to anyone in the company.

6). Chaney's belated and incredible explanation that he had been forced to use marijuana two to three weeks earlier to maintain his undercover identity.

The court found that Chaney failed to show that these explanations for his discharge were pretextual. Specifically, the incidents involving drug use by the three trainmen and Alice Buxton, although sufficient to create a *prima facie* case, could not overcome Southern Railway's rebuttal, because both incidents involved off-duty drug use, not a ground for termination under Rule G. Moreover, the court found that because Chaney was a non-union employee, the railway had greater discretion in dealing with him than with employees represented by a union. Furthermore, the court found that as the railway was not aware of the exact type of drug test that would be given to Chaney, and as it was unaware that the test could be or was in fact racially biased, Chaney could not establish a pretext for intentional discrimination by relying on the test. Accordingly, the court found that Chaney did not carry his burden of showing that he was discharged because of his race, concluding that the company had the right to discharge him based on its good faith belief that he had used marijuana while on duty.

The standard governing our review of the district court's determination that Southern Railway did not intentionally discriminate against Chaney is set forth in Fed.R.Civ.P. 52(a): "Findings of fact shall not be set aside unless clearly erroneous, and due regard shall be given to the opportunity of the trial court to judge the credibility of the witnesses." *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518, 528 (1985). "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–74, 105 S.Ct. at 1511, 84 L.Ed. at 528. Although there are troubling differences between the way Southern Railway treated the three trainmen and the way it treated Chaney, employing this standard of review, we cannot say that the district court's determination was clearly erroneous.

Chaney argues that he has proven discriminatory treatment in several ways. First, he points out that Southern Railway agreed that it would not have fired him if

he had not tested positive for marijuana use. Even disregarding the purported racial bias of the test, of which Southern Railway had no reason to know, Chaney argues that at most the test result showed that he had smoked marijuana while off-duty, referring to the incident where he allegedly smoked marijuana to maintain his undercover identity. He therefore argues that, because the company only reasonably should have assumed that he smoked marijuana while off-duty, it should have retained him, as it did the three white trainmen and Alice Buxton. The district court, however, evidently gave little credence to Chaney's belated explanation of off-duty marijuana use and, having reviewed the transcript, we must agree. Although in retrospect, Southern Railway's reliance on the EMIT test result was misplaced, it did not knowingly or intentionally discriminate, under a disparate treatment analysis, through its use of the test. Moreover, the district court set forth six other valid reasons supporting Chaney's discharge, and it seems clear from the record and the district court's findings that Southern Railway merely used the test to confirm its belief that Chaney had smoked marijuana while on duty. Additionally, even discounting the test result, once Chaney provided his lame excuse regarding off-duty use of marijuana to preserve his undercover identity, the company had further reason to believe he was trying to cover up his on-duty use of marijuana.

Admittedly, it is disturbing that Southern Railway did so little to discipline the three trainmen caught with marijuana in Mississippi, and Chaney makes much of this fact. Although the arrests occurred while the men were off-duty, Chaney argues that the men still could have been under the influence of marijuana and alcohol at the time they worked on the train early the next morning. Reporting for duty under the influence of alcohol or other intoxicant was a ground for discharge under Southern Railway's operating rules. The district court, however, had the opportunity to make credibility determinations and concluded that there was "no evidence of any drug use while on duty by either of these three white employees," and we cannot say that this finding is clearly erroneous. The court recognized that at least one of the three probably used marijuana while in Meridian, but did not find that the men were under the influence when they returned to work. Chaney, therefore, has failed to meet the ultimate burden of showing that Southern Railway treated him in an unlawfully discriminatory fashion.

### III.

Employment practices alleged to be "fair in form, but discriminatory in operation" are evaluated under the three-part disparate impact analysis set forth in *Griggs v. Duke Power Co.*, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971) and its progeny. *See, e.g., Connecticut v. Teal*, 457 U.S. 440, 446–47, 102 S.Ct. 2525, 2530–31, 73 L.Ed.2d 130, 136–37 (1982); *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 425, 95 S.Ct. 2362, 2375, 45 L.Ed.2d 280, 300–01 (1975). "In order to establish a prima facie case of discrimination, a plaintiff must show by a preponderance of the evidence that a facially neutral employment practice had a substantial adverse impact upon a protected group." *Kilgo v. Bowman Transportation, Inc.*, 789 F.2d 859, 867–68 (11th Cir. 1986) (citing *Teal*, 457 U.S. at 446, 102 S.Ct. at 2530, 73 L.Ed.2d at 136–37; *Maddox v. Claytor*, 764 F.2d 1539, 1548 (11th Cir. 1985)). "The burden then shifts to the employer to show that the challenged employment practice has a 'manifest relationship' to the employment in question, or in other words that it is supported by 'business necessity.'" *Craig v. Alabama State University*, 804 F.2d 682, 685 (11th Cir. 1986) (citing *Griggs*, 401 U.S. at 431–32, 91 S.Ct. at 853–54, 28 L.Ed.2d at 164–65). In a suit alleging disparate impact, unlike one alleging disparate treatment, the employer must do more than articulate a justification for the practice; it must show that the disputed practice was a "business necessity." *Nash v. Consolidated City of Jacksonville*, 763 F.2d 1393, 1397 (11th Cir. 1985). If the employer meets this burden, the employee must be given the opportunity to establish "that the employer was us-

ing the practice as a pretext for discrimination or that other criteria were available with a lesser adverse impact on the minority that would still serve the employer's needs." *Craig*, 804 F.2d at 685 (citing *Albemarle Paper Co.*, 422 U.S. at 425, 95 S.Ct. at 2375, 45 L.Ed.2d at 301).

 In this case, although Chaney raised a disparate impact claim, the district court did not undertake a disparate impact analysis as set forth above. First, although the court found the EMIT test to be "invalid" and "unreliable for a number of reasons," it did not specifically determine, as required for a *prima facie* case of disparate impact, whether the test had a "substantial adverse impact upon a protected group." *Kilgo*, 789 F.2d at 867–68. The court merely stated that it "credit[ed] the testimony of Dr. James Woodford," but did not explain whether Dr. Woodford's testimony was sufficient to create a *prima facie* case. Furthermore, the court found the test's invalidity "irrelevant" because of Chaney's admission that he smoked marijuana two or three weeks previously. We disagree with the district court's reasoning. That Chaney may have smoked marijuana while off-duty several weeks before being tested has nothing to do with his disparate impact claim. The company used the test to confirm suspected on-duty drug use and it admitted that it would not have discharged Chaney without the positive test result. If the test in fact has a substantial adverse impact upon a protected group, whether or not Southern Railway intended it to do so, then Chaney would have stated a *prima facie* case. Because the district court, although finding the EMIT test invalid and unreliable, did not specifically determine whether the test had a substantial adverse impact upon a protected group, we remand for the district court to give full consideration to appellant's disparate impact claim.

## IV.

For the foregoing reasons, the decision of the district court is AFFIRMED in part and REVERSED in part and REMANDED for further consideration of appellant's disparate impact claim.