Travis WADE, Petitioner,

v.

Robert FARLEY, and Indiana Attorney General, Respondents.

No. 3:93cv0619AS.

United States District Court,
N.D. Indiana,
South Bend Division.

Aug. 3, 1994.

Travis Wade, pro se.

Thomas D. Quigley, Office of Indiana Atty. Gen., Indianapolis, IN, for respondents.

## MEMORANDUM AND ORDER

ALLEN SHARP, Chief Judge.

On September 2, 1993, *pro se* petitioner, Travis Wade, an inmate at the Indiana State Prison, Michigan City, Indiana, filed a petition seeking relief under 28 U.S.C. § 2254. The return filed by the respondents on February 25, 1994, demonstrates the necessary compliance with *Lewis v. Faulkner*, 689 F.2d 100 (7th Cir.1982). The filing of the response renders MOOT the filings of the petitioner on February 16, 1994, namely, his request for a default. The petitioner filed a very lawyer-like Traverse, which this court has carefully examined.

The petitioner is challenging three separate CAB proceedings. The court is well aware of its obligations under such cases as *Hamilton v. O'Leary*, 976 F.2d 341 (7th Cir. 1992), *Forbes v. Trigg*, 976 F.2d 308 (7th Cir.1992), *Miller v. Duckworth*, 963 F.2d 1002 (7th Cir.1992), and *Harris v. Duckworth*, 909 F.2d 1057 (7th Cir.1990). *See also Billops v. Wright*, 803 F.Supp. 1439 (N.D.Ind.1992).

The petitioner challenges three different CAB proceedings and each was originally filed as a separate action. This court consolidated all three into the above captioned case.

The first CAB proceeding involved the charge of threatening another at the Correctional Industrial Complex in Pendleton, Indiana in May, 1991. On December 17, 1993, the disciplinary sanction was reversed and all sanctions were rescinded, rendering that claim moot. Essentially, based on this fact, there are only two disciplinary proceedings at issue in the § 2254 action.

In RDC 92–08–0033, while the petitioner was confined at the Correctional Industrial Complex in Pendleton, Indiana, he was charged with use of a controlled substance. On August 7, 1992, prison officials smelled marijuana coming from the petitioner's room. A search of the petitioner's room revealed no evidence of unauthorized drugs, and no charges were initiated. On August 10, 1992, CIC Officer James Dick ordered the petitioner to submit to a urine test. The Attorney General indicates that "[b]efore submitting to a urine sample, [the petitioner] was strip

searched, and a rubber item appearing to be a finger tip from a glove was found attached to his penis by rubber bands." *See Memorandum in Support of Return to Order to Show Cause.* "The rubber [receptacle], which contained urine, was confiscated[, and the petitioner] then produced a sample of his own urine." *Id.* The urine tested positive for THC and cocaine.

On August 24, 1992, the petitioner received a copy of the Notice of Disciplinary Hearing. The Notice indicates that the petitioner requested four witnesses and a lay advocate. Three of the requested witnesses were inmates, and the lay advocate was Timothy Shelton. The Attorney General indicates that:

> Two forms of this notice exist; in one, the name James Johanningsmeier appears faintly below Shelton's name, while in the other Shelton's name is stricken through and there is written, "Offender refused. Also not on list." Offender Johanningsmeier agreed to serve.

*Id.*

On August 26, 1992, a disciplinary hearing was held in front of a single officer. The Report of Disciplinary Hearing indicates that the petitioner gave the following testimony at the proceeding:

> I'm not saying I've not smoked pot before but I quit approx. 3 mo. when Ofc. Masters started on Dorm A and he was constantly shaking me down saying, "I know your dirty. I'm going to get you one way or I'll drop you, but I'll get you." Plus I know for a fact that on 7–6–92 they found joints (3–4), floating in coffee pot. Then again on 8–2–92. So I think I was singled out when I think everyone else whom drinks from coffee pot would come up dirty. This is due to the investigator having a dislike for me, "Cambron." That's why I got a rubber glove with piss from someone who don't drink fm coffee pot.

*Id.* The hearing officer also "noted that he had contacted Mr. Hummel, whom [the petitioner] had identified as the unit manager of his dorm at CIC...." The petitioner had requested Mr. Hummel on his witness list. The hearing officer explained that "Mr.

Hummel had said that only two cigarettes had been found in the coffee pot and that had been 'some time ago.'" *Id.* "The other witnesses identified by [the petitioner] were not contacted by the officer." *Id.*

The hearing officer found the petitioner guilty of the abovementioned charges and explained:

> Due to amount of drugs in system along w/statement at hearing that he admitted he knew he was dirty on drop also by trying to conceal. Via tx. Mr. Hummel stated there were only 2 untested cigarettes found in hot water pot. Also only hot water in coffee pot and not as stated by offender Wade.

*Id.* In finding the petitioner guilty, the hearing officer noted that he had tested positive not only for marijuana but also for cocaine. As explained by the Attorney General, "[t]he hearing officer found the petitioner guilty, basing his finding on the conduct and investigation reports as corroborated by Wade's attempt to substitute another inmate's urine for his and by his flushing something down the toilet immediately after discharging it into the water." *Id.* The officer demoted Wade one credit class, took away 150 days of earned credit time, and ordered him to serve 30 days in disciplinary segregation.

The petitioner pursued the applicable administrative appeals as mandated by *Markham v. Clark,* 978 F.2d 993 (7th Cir.1992). In his appeal papers, the petitioner listed the following errors:

> With regard to the hearing officer's failure to contact the three CIC inmates he had listed among his four witnesses, Wade stated that the inmates would have been able "to verify that drugs had been found in the coffee pot several times and as recent as 8–2–92, when Wade was drug screened on 8–10–92". Wade asserted that the hearing officer's refusal to call the inmates, based as it was on the quantity of drugs found in Wade's system, deprived him of a valid defense. He wrote:
>
> > I never contended that I was not dirty. But that the reason I was is because someone spiked the coffee pot water on several occasions July 6th 1992, Aug 2

1992 and other times with marijuana joints and possibly cocaine and that I knew there were drugs in my system because I drank water out of the coffee pot at the times when drugs were found in the coffee pot and the drugs that were in my system were not put there knowingly.

*Id.* (spelling corrected by the Attorney General in their brief).

On September 2, 1992, the Superintendent of CIC denied the petitioner's appeal. In his response, the Superintendent addressed the witness question as follows:

The Hearing Officer denied witnesses based on Section 24–D of the ADPP [Adult Disciplinary Policy Procedures]. You offer little in your appeal regarding any impact the witnesses would have provided. It is acknowledged that two cigarettes (which could have contained marijuana) were found on one occasion in the hot water pot on [the unit]. The hypothesis that a "free" high was regularly provided to offenders in A-building by putting marijuana (in cigarette papers?) into the coffee water is a novel idea, but inherently ridiculous.

*Id.*

It needs to be emphasized that this court does not sit as a trier de novo in state court criminal proceedings and does not sit as a court of general common law review. The collateral review that is envisioned by § 2254 focuses on violations of the federal Constitution. *See Bell v. Duckworth,* 861 F.2d 169 (7th Cir.1988), *cert. den.,* 489 U.S. 1088, 109 S.Ct. 1552, 103 L.Ed.2d 855 (1989). It needs to be mentioned that simply violating statutes or regulations does not generally of itself come within the ambit of § 2254. *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991).

The petitioner asserts that the abovementioned urine test and the attendant procedures violate his Fourth Amendment rights. On this issue, the petitioner indicates that "[a]n officer's alleged detection [of the] odor of burnt marijuana [ ] does not necessarily establish probable cause[, and t]he issue of probable cause is critical in that [the] urinalysis is to be 'random'" *See Memorandum in Opposition to Respondent's Return to Or-*der *to Show Cause.* Furthermore, the petitioner asserts that "an unconstitutional search and seizure occurred because 1) prison officials had prior knowledge of the drugs in the pot; 2) the tests were made for harassment purposes in retaliation against [the p]etitioner [by] reporting Officer Masters; 3) [the p]etitioner was singled out (he was the only one tested that day)." *Id.*

It is important to note the Fourth Amendment ramifications of this issue. The "language of the [Fourth A]mendment raises two questions: (1) when has a search and seizure occurred, triggering the protections of the [Fourth Amendment], and (2) when is a search or seizure prohibitively unreasonable?" Sheldon Krantz and Lynn S. Branham, *The Law of Sentencing, Corrections, and Prisoner's Rights: Cases and Materials* (4th Ed.) at 409 (Searches, Seizures, and Privacy Rights). Any discussion of the Fourth Amendment in the context of the penological system must begin with two very important Supreme Court opinions issued in *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984), and *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

In *Hudson v. Palmer, supra,* the Court, speaking through Chief Justice Burger, evaluated the first of the Fourth Amendment issues. Specifically, the Court evaluated whether an inmate has a "right of privacy in his prison cell entitling him to the protection of the Fourth Amendment...." *Id.* The Court explained "that society is not prepared to recognize as legitimate any subjective expectation of privacy that a prisoner might have in his prison cell and that, accordingly, the Fourth Amendment proscription against unreasonable searches does not apply within the confines of the prison cell." *Id.* In reaching this decision, the Court indicated that "[p]risons, by definition, are places of involuntary confinement of persons who have a demonstrated proclivity for antisocial criminal, and often violent conduct." *Id.* Finally, the Court stated "[i]nmates have necessarily shown a lapse in ability to control and conform their behavior to the legitimate standards of society by the normal impulses of self-restraint; they have shown an inability

to regulate their conduct in a way that reflects either a respect for law or an appreciation of the rights of others." *Id.*

In *Bell v. Wolfish, supra,* the Court, speaking through then Justice Rehnquist, discussed the second of the abovementioned issues in the context of the Fourth Amendment ramifications of body cavity searches. On this issue, the Court explained that:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. A detention facility is a unique place fraught with serious security dangers. Smuggling of money, drugs, weapons, and other contraband is all too common an occurrence. And inmate attempts to secrete these items into the facility by concealing them in body cavities are documented in this record and in other cases.

*Id.*

In *Rights of Prisoners,* the author, Michael Mushlin, explains that "[r]equired participation in a urine-screening program designed to detect drug use has been upheld numerous times." *Michael Mushlin, Rights of Prisoners* § 8.09 (urinalysis). "Such testing is justified, in the context of prison searches, on the ground that it is a reasonable way to balance the significant and legitimate security interests of the institution against the privacy interests of the inmates." *Id.* The balancing test outlined in *Bell v. Wolfish, supra,* is echoed in *Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989) and *National Treasury Employees Union v. Von Raab,* 489 U.S. 656, 109 S.Ct. 1384, 103 L.Ed.2d 685 (1989). *See also Schaill v. Tippecanoe County School Corporation,* 679 F.Supp. 833 (N.D.Ind.), *aff'd,* 864 F.2d 1309 (7th Cir.1988). It is clear from the cases that the Fourth Amendment, proscribes searches that are *unreasonable,* and a balance generally must be constructed between the intrusion upon the individual's privacy and the government's interests.

Recently, the Seventh Circuit in *Forbes v. Trigg,* 976 F.2d 308 (7th Cir.1992), revisited this issue and outlined the parameters of the Fourth Amendment for purposes of a urinalysis test:

> Urine tests are searches for Fourth Amendment purposes, and prison inmates retain protected privacy rights in their bodies, although these rights do not extend to their surroundings. See e.g., *Hudson v. Palmer,* 468 U.S. 517, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984) (no privacy interest in prison cell); *Spence v. Farrier,* 807 F.2d 753, 755 (8th Cir.1986) (urinalysis is search for Fourth Amendment purposes). Moreover, for Fourth Amendment purposes, urinalysis is analogous to body cavity searches and blood tests. *Tucker v. Dickey,* 613 F.Supp. 1124 (D.C.Wis.1985) (urine sample analogous to blood test for Fourth Amendment purposes); *Storms v. Coughlin,* 600 F.Supp. 1214, 1220 (S.D.N.Y.1984). In *Bell v. Wolfish,* the Supreme Court examined the constitutionality of post-visitation body cavity searches. 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), and explained that the basic test for the constitutionality of a search that invades the integrity of an inmate's body is reasonableness. In each case [the Fourth Amendment] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted. *Wolfish,* 441 U.S. at 559, 99 S.Ct. at 1884 (citations omitted). The Court stressed that prison administrators are accorded "wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Id. at 547, 99 S.Ct. at 1878. Further, subsequent cases have noted that "the unauthorized use of narcotics is a problem that plagues virtually every penal and detention center in the country." *Spence v. Farrier,* 807 F.2d 753,

755 (8th Cir.1986) (citing *Block v. Rutherford,* 468 U.S. 576, 588–89, 104 S.Ct. 3227, 3233–34, 82 L.Ed.2d 438 (1984)). *Id.*

■ Here, the plaintiff maintains that prison officials must have probable cause in order to require an inmate to submit to a urinalysis test, otherwise the plaintiff maintains the test is a violation of his Fourth Amendment rights. Here, a prison official smelled marijuana emanating from the petitioner's room three days before requiring the petitioner to submit to the urine test. This court finds sufficient probable cause. This court also notes that "[o]ther courts have held that no probable cause is required for state prison officials to demand that a prisoner provide a urine sample." *See Mushlin, supra* citing *Pella v. Adams,* 638 F.Supp. 94 (D.Nev.1986); *Ramey v. Hawk,* 730 F.Supp. 1366 (E.D.N.C.1989). This court finds no Fourth Amendment violation. The prison officials had probable cause to conduct the search and the search was conducted in a reasonable manner.

The petitioner asserts that submitting to a urine test is a violation of the Fifth Amendment right against self-incrimination. An argument of this nature is not cognizable under *Schmerber v. California,* 384 U.S. 757, 86 S.Ct. 1826, 16 L.Ed.2d 908 (1966), and it is doubtful that an argument of this nature is applicable to prison environments. In addition, the petitioner contends that "he was not given a copy of the result of the drug test before or during the disciplinary hearing, and that the period of time given [to] him to examine it at the hearing was inadequate." *See Memorandum in Opposition to Respondent's Return to Order to Show Cause.* Insofar as any challenges to this evidence are extremely limited, this court finds that allowing the petitioner to examine the drug test results at the hearing passes constitutional muster. This court in *Wykoff v. Resig,* 613 F.Supp. 1504 (N.D.Ind.1985), *aff'd by unpublished order,* 819 F.2d 1143 (7th Cir.1987), cautioned prison officials "to insure the basic integrity of the system." *Id.* This court also admonished that "this court, or for that matter, any court, does not have the time to hear complaints based on the inadequate chain of

custody for prisoner's urine samples." *Id.* This court also indicated that "due process . . . requires that inmates receive a duplicate copy of the EMIT test results from the laboratory which conducted the test." *Id.*

This court notes that the petitioner was only given a minimal amount of time to scrutinize the drug test results, however, this court notes that since the *Wykoff* decision other courts have considered this issue. In *Spence v. Farrier,* 807 F.2d 753 (8th Cir. 1986), the Eighth Circuit considered the due process ramifications of the EMIT test and whether confirmatory tests must be performed in order to comply with due process:

> The EMIT test results obviously provide some evidence of drug use. EMIT tests have been found sufficiently reliable to meet the requirements of the due process clause. See, e.g., *Harmon v. Auger,* 768 F.2d 270 (8th Cir.1985) (EMIT test results are ninety-five per cent (95%) accurate and form a sufficient basis for disciplinary action); *Wykoff v. Resig,* 613 F.Supp. 1504 (N.D.Ind.1985) (a positive EMIT test confirmed by a second EMIT test or its equivalent satisfies due process); *Jensen v. Lick,* 589 F.Supp. 35 (D.N.D.1984) (prison officials could impose sanctions on prisoners based upon an unconfirmed EMIT test); *Peranzo v. Coughlin,* 608 F.Supp. 1504 (S.D.N.Y.1984) (double EMIT testing held sufficient to satisfy due process); *Hoeppner v. State,* 379 N.W.2d 23, 25 (Iowa App.1985) ("the limited rights set forth in *Wolff [v. McDonnell]* do not entitle a prisoner to an independent sample of evidence used in a disciplinary proceeding"); and *Smith v. State,* 250 Ga. 438, 298 S.E.2d 482 (1983) (the EMIT test is sufficiently reliable to stand as the only evidence in a parole revocation hearing). But see, *Higgs v. Wilson,* 616 F.Supp. 226 (W.D.Ky.1985); and *Kane v. Fair,* 33 Cr.L. 2492 (Mass.Super 1983). We hold that the EMIT test, as used at Iowa State Penitentiary with a confirmatory second test, contains sufficient indicia of reliability to provide some evidence of drug use.

*Id.*

In addition, on the issue of due process, this court notes that in *Thompson v. Owens,*

889 F.2d 500 (3rd Cir.1989), the Third Circuit evaluated the due process ramifications of this issue in light of *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). In *Thompson*, the court considered whether the failure of certain prison officials' to provide complete chain of custody evidence at a misconduct hearing violated due process. In *Thompson*, the inmate "tested positive on his urinalysis drug test and was convicted of misconduct [and] ... suffered a significant loss of benefits." *Id.* The inmate "alleged in his complaint that, because there was no evidence of the chain of custody of his urine sample, test results based upon it could not be placed into evidence in the record of proceedings." *Id.* In prior proceedings in *Thompson*, the district court "conclud[ed] that despite the absence of 'chain of custody' evidence, the positive results of appellant's urinalysis tests amounted to 'some' evidence sufficient to support a finding of misconduct and to satisfy due process." *Id.*

In considering whether it was proper for the district court to dismiss the complaint, the Third Circuit, speaking through Judge Becker explained:

> The quantum of evidence necessary in the context of prisoner disciplinary proceedings was described by the Supreme Court in *Superintendent v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985):
>
> > We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.... We decline to adopt a more stringent evidentiary standard as a constitutional requirement.

*Id.* at 455–56, 105 S.Ct. at 2774 ... This case is controlled by *Hill.*

> [The inmate] does not allege that prison officials tampered with the samples. Nor does he allege that the prison officials failed to follow their own procedures. [The inmate] merely argues that if officials do not submit a complete chain of custody account for the samples, any test results based on those samples must be considered unreliable. However appealing this argument may be, it does not present a viable constitutional claim. The due process requirements in this context are minimal, and they are met here. Positive urinalysis results based on samples that officials claim to be appellant's constitute some evidence of appellant's drug use. A chain of custody requirement would be nothing more or less than an "independent assessment" into the reliability of the evidence, and *Hill* tells us, explicitly, that such a "credibility" determination is not required....

*Id.*

■ Based on the foregoing discussion of the constitutional challenges available to this petitioner, this court finds no due process violation is cognizable when the prison officials provided the petitioner with a copy of the drug test results at the CAB proceeding, even though it was for a limited time. *See also Higgs v. Bland*, 888 F.2d 443 (6th Cir. 1989).

In seeking a writ of habeas corpus, the petitioner asserts that several of his due process rights were violated during the CAB proceeding. The record of the proceedings is before the court and must be examined under the constitutional standards established in *Supt., Mass. Corr. Institution at Walpole v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985), and *Wolff v. McDonnell*, 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974). This court notes the decision in *Rasheed–Bey v. Duckworth*, 969 F.2d 357 (7th Cir.1992). In *Rasheed–Bey*, the Seventh Circuit listed the applicable due process requirements for a CAB hearing:

> The requirements imposed by the Due Process Clause are "flexible and variable dependent upon the particular situation be-

ing examined." *Hewitt v. Helms,* 459 U.S. 460, 472, 103 S.Ct. 864, 871, 74 L.Ed.2d 675 (1983). We "cannot automatically apply procedural rules designed for free citizens in an open society . . . to the very different situation presented by a disciplinary proceeding in a state prison." *Wolff v. McDonnell,* 418 U.S. 539, 560, 94 S.Ct. 2963, 2977, 41 L.Ed.2d 935 (1974). Nonetheless, "a prisoner is not wholly stripped of constitutional protection when he is imprisoned for a crime. There is no iron curtain drawn between the Constitution and the prisons of this country." *Id.* at 555–56, 94 S.Ct. at 2974. Accordingly, in considering the command of the Due Process Clause in light of the peculiar exigencies of the prison setting, the Supreme Court has held that an inmate, while not entitled to the full panoply of due process rights accorded to free citizens, is entitled to fundamental protection from the arbitrary action of government. *Wolff,* 418 U.S. at 556–58, 94 S.Ct. at 2974–76; *Hewitt,* 459 U.S. at 472, 103 S.Ct. at 871–72.

Beginning with *Wolff,* the Supreme Court established the minimum requirements of procedural due process to be afforded to prisoners in disciplinary proceedings. Before being deprived of a protected liberty interest, a prisoner is entitled to (1) advance (at least 24 hours before hearing) written notice of the claimed violation; (2) the opportunity to be heard before an impartial decision maker; (3) the opportunity to call witnesses and present documentary evidence (when consistent with institutional safety); and (4) a written statement by the fact-finder of the evidence relied on and the reasons for the disciplinary action. *Superintendent Mass. Corr. Inst. v. Hill,* 472 U.S. 445, 453–55, 105 S.Ct. 2768, 2773, 86 L.Ed.2d 356 (1985); *Wolff v. McDonnell,* 418 U.S. 539, 563–67, 94 S.Ct. 2963, 2978–80, 41 L.Ed.2d 935 (1974). Inmates have no right to confront and cross examine adverse witnesses; thus, a disciplinary board's decision is not limited to evidence presented at the hearing. *Baxter v. Palmigiano,* 425 U.S. 308, 322–23, 96 S.Ct. 1551, 1559–60, 47 L.Ed.2d 810 (1976). Furthermore, this court has held that an inmate is also entitled to

disclosure of exculpatory evidence, unless that disclosure would unduly threaten institutional concerns. *Mendoza v. Miller,* 779 F.2d 1287 (7th Cir.1985), *cert. denied,* 476 U.S. 1142, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1986); *Dawson v. Smith,* 719 F.2d 896, 898–99 (7th Cir.1983). If such information is to remain confidential, it must be supported by some indication of reliability. *Mendoza,* 779 F.2d at 1295 (citations omitted).

*Id.*

The petitioner maintains that the hearing officer conducting the disciplinary proceeding did not permit the petitioner to use the lay advocate of his choice. In *Miller v. Duckworth,* 963 F.2d 1002 (7th Cir.1992), the Seventh Circuit addressed a very similar issue. In *Miller,* in seeking a writ of habeas corpus, the petitioner contended that the due process dictates as outlined in *Wolff, supra,* required the appointment of a lay advocate. "To support his contention that he was entitled to the assistance of a lay advocate, [the petitioner] assert[ed] that *Wolff* should be read to require the appointment of a lay advocate whenever a prisoner is unable to collect and present evidence for his defense, regardless of whether the prisoner was illiterate or the issues complex." *Id.*

On this issue, the *Miller* court, speaking through Judge Kanne, outlined the fundamental tenets of *Wolff,* and then explained:

We find no language in *Wolff* to support so broad a construction. *Wolff*'s provision for lay assistance is plainly contingent on the inmate's illiteracy or the complexity of the case, and [the petitioner] does not cite—nor can we find—any authority suggesting otherwise. Simply put, there is no basis for expanding the limited role of lay advocate assistance for prison inmates beyond that recognized in *Wolff.*

Without the benefit of an unnecessarily expansive reading of *Wolff,* [the petitioner's] claim for lay advocate assistance must fail. Considering [the petitioner's] pro-se pleadings and other submissions to the district court, it seems readily apparent that he is far from illiterate. Nor are the issues presented in his case so complex as

to warrant the appointment of a lay advocate; indeed, [the petitioner] himself admitted that he was guilty as charged of the institutional violation. We therefore hold that the district court properly concluded that [the petitioner] was not deprived of any federal constitutional rights by the Board's failure to appoint a lay advocate to assist him during the disciplinary hearing.

*Id.*

■ In *Lippert v. Penfold,* 618 F.Supp. 510 (N.D.Ind.1984), the plaintiff in a § 1983 lawsuit asserted that "his constitutional right to due process during a Conduct Adjustment Board hearing [was violated because] he was advised that he could not have a particular lay advocate represent him." *Id.* In evaluating the issue, this court and this judge explained:

> In applying the *Wolff v. McDonnell, supra,* standard, this court in *Hendrix v. Faulkner,* 525 F.Supp. 435, 447 ( [N.D.Ind.]1981), *aff'd in part, rev'd in part on other grounds, sub nom. Wellman v. Faulkner,* 715 F.2d 269 ( [7th Cir.]1983), stated:
>
> > [The p]laintiff ... secondly complains that he was denied the lay assistance of his choice at the disciplinary hearing ... This does not rise to a constitutional level because the C.A.B. fully complied with the requirements of *Wolff* in regard to lay assistance.
>
> (The Seventh Circuit in *Wellman v. Faulkner, supra,* reversed the district court only as to the issues spelled out in their decision and upheld the district court in all other issues, i.e., the right to a lay advocate of one's choosing does not rise to the claim of constitutional level.)

This court in *Lewis v. Faulkner,* 559 F.Supp. 1316, 1320 (1983) held:

> It is true that the State may not generally prohibit lay advocates from advising or assisting other inmates. *Johnson v. Avery,* 393 U.S. 483, 89 S.Ct. 747, 21 L.Ed.2d 718 (1969). Further, the states have an affirmative obligation to provide prisoners either with adequate law libraries, or persons trained in the law. *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977); *Garza v. Miller,* 688 F.2d 480 (7th Cir.1982).

Even so, inmates appearing before prison disciplinary boards have no right to counsel. *Baxter v. Palmigiano,* 425 U.S. 308, 96 S.Ct. 1551, 47 L.Ed.2d 810 (1976). Thus, while an inmate may be entitled to the assistance of a lay advocate, the fact that he does not get the lay advocate of his choice does not rise to the level of a constitutional deprivation. *Hendrix v. Faulkner,* 525 F.Supp. 435 (N.D.Ind.1981).

*Id.* Here, the petitioner's claim that his due process rights were violated by not being provided the lay advocate of his choice is foreclosed by the abovementioned caselaw.

Next, the petitioner contends that the hearing officer failed to call the witnesses requested by the petitioner. In evaluating this claim, the court must revisit the Supreme Court decision in *Ponte v. Real,* 471 U.S. 491, 105 S.Ct. 2192, 85 L.Ed.2d 553 (1985). In *Ponte,* the Court explained that "chief among the due process minima outlined in *Wolff* was the right of an inmate to call and present witnesses ... in his defense before a disciplinary board." *Ponte,* 471 U.S. at 496–97, 105 S.Ct. at 2196. Insofar as a prisoner has this right to present witnesses, it "is necessarily circumscribed by the ... need to provide swift discipline." *Id.* at 495, 105 S.Ct. at 2195 (quoting *Baxter v. Palmigiano,* 425 U.S. 308, 321, 96 S.Ct. 1551, 1559, 47 L.Ed.2d 810 (1976); *Wolff,* 418 U.S. at 556, 94 S.Ct. at 2974–75). It is also proscribed by the necessity of avoiding situations that are "unduly hazardous to institutional safety or correctional goals." *Id.* The parameters "placed upon an inmate's right to call witnesses do not give prison officials the unfettered discretion to deny that right for no reason at all." *Jackson v. O'Leary,* No. 89 C 7383, 1992 WL 38403, 1992 U.S.Dist. LEXIS 2108 (N.D.Ill. Feb. 25, 1992). In *Ponte,* the Court explained that the CAB may be required to explain the denial at either the disciplinary hearing or in a subsequent court proceeding. The Court indicated:

> [T]o hold that the Due Process Clause confers a circumscribed right on the inmate to call witnesses at a disciplinary hearing, and then conclude that no explanation need ever be vouched for the denial

of that right, either in the disciplinary proceeding itself or if that proceeding be later challenged in court, would change an admittedly circumscribed right into a privilege conferred in the unreviewable discretion of the disciplinary board. We think our holding in *Wolff* meant something more than that.

*Ponte,* 471 U.S. at 498, 105 S.Ct. at 2197.

Here, the hearing officer indicated that the three inmates were not included as witnesses "due to [the] amount of drugs in [the petitioner's] system." *See Return to Order to Show Cause.* In addition, the Attorney General asserts that "the very high amount of THC [that the petitioner] had in his body negated any reasonable inference that he had given a positive reading on the test because of a couple of joints in several gallons of drinking water several days before." *Id.* Here, the hearing officer outlined his reasons on the record. In evaluating this issue, this court notes that the Superintendent addressed the witness question as follows:

> The Hearing Officer denied witnesses based on Section 24–D of the ADPP [Adult Disciplinary Policy Procedures]. You offer little in your appeal regarding any impact the witnesses would have provided. It is acknowledged that two cigarettes (which could have contained marijuana) were found on one occasion in the hot water pot on [the unit]. The hypothesis that a "free" high was regularly provided to offenders in A-building by putting marijuana (in cigarette papers?) into the coffee water is a novel idea, but inherently ridiculous.

*Id.* This court also notes that § 24–D of the ADPP states:

> The hearing committee shall call witnesses requested by the offender unless one or more of the following conditions are present:
>
> (1). Testimony to be offered is irrelevant or repetitive.
>
> (2). There is a lack of necessity for the testimony in order for the Hearing Officer or committee to have a full understanding of the offense and defense(s) asserted by the offender . . . .

*See Adult Disciplinary Policy Procedures* § 24–D.

■ On this issue, the Attorney General indicated that during the CAB proceeding, "[t]he hearing officer did contact one [of the requested witnesses], the unit team manager, who verified [the petitioner's] story that cigarettes, perhaps containing marijuana, had been found in the coffee pot in the past." *See Memorandum in Support of Return to Order to Show Cause.* The Attorney General concedes that the hearing officer did *not* take testimony from the three requested inmate witnesses, however, as this court indicated such action is within the purview of the hearing officer if there are valid reasons for that action. Here, the Attorney General argues that the reasons placed on the record are valid. Specifically, the hearing officer refused the take further testimony "due to [the] amount of drugs in [the petitioner's] system." *Id.* This reason is valid because of the "very high amount of THC [in the petitioner's body] negated any reasonable inference that he [received] a positive reading on the test because [of the placement of marijuana cigarettes] in the drinking water . . . ." *Id.* In addition, "[t]he officer also based his decision on the 'statement at [the] hearing that he admitted he knew he was dirt[y] on drop also by trying to conceal.'" *Id.* Therefore, explains the Attorney General:

> If [the petitioner] had accidentally ingested THC as he claimed, he would not have known he was "dirty," he would have thought he was not. In that case, it would not have occurred to him to obtain someone else's urine. If he believed he was "dirty," then he had drunk the THC *knowing it was there.* It makes no difference how the drug is ingested, whether by smoking, drinking, or otherwise. Thus, the effort to conceal the presence of the THC by obtaining another inmate's urine, which [the petitioner] admitted, was fundamental evidence of guilt.

The only conceivable way [the petitioner] could be innocent of knowingly ingesting marijuana in one form or another that is consistent with the story he tells is for him to have drunk large amounts of tainted water over a long period of time without

suspecting that he was doing so. Such a theory, as the superintendent of CIC noted, is absurd, for it would mean that continuously without anyone noticing it.

When the situation is fully understood, the hearing officer's decision not to disrupt the CIC by calling several inmates to the telephone is entirely reasonable. If they testified to an occasional tainting of the water it would not have exonerated [the petitioner,] and they had testified to constant presence of marijuana their testimony would have been incredible and would still have led to the conclusion that [the petitioner] must have known about the substance and drunk the water [anyway]. Consequently, such testimony could not have helped [the petitioner].

*Id.* This court finds those reasons valid and constitutional.

■ Next, the petitioner claims his due process rights were violated when he and his lay advocate were excluded from the proceeding when the hearing officer heard testimony from the unit team manager from CIC. In asserting this claim, the petitioner refers to § 23(4) of the Adult Disciplinary Policy Procedures. While this court notes that there is no right to confront or cross-examine witnesses, the exclusion of the inmate from the proceedings may have been unnecessary. In *Cortez v. Coughlin,* 67 N.Y.2d 907, 501 N.Y.S.2d 809, 492 N.E.2d 1225 (1986), "a New York court held that the disciplinary committee could exclude an inmate from the hearing when the inmate's witnesses were testifying." *See Mushlin* at 461. In addition, "[t]he court advised that the committee should document the reasons for following this procedure on the administrative record so that the inmate could evaluate them before for judicial review." *Id.* While the CAB did not document any reasons, this court presumes that this decision was made for purposes of institutional safety. In the future, if the members of the CAB decide to exclude the inmate from the proceedings, the CAB should explain their reasons for the action on the record.

■ This court notes that the petitioner asserts a plethora of other contentions. Several relate solely to the failure of the CAB members to follow certain provisions of the Adult Disciplinary Policy Procedures. Certainly, the extent to which claims are made purely with reference to the violation of state statutes, the teaching of *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), is applicable. The statutes in question certainly do not create a liberty interest as relevant here. *See Wallace v. Robinson,* 940 F.2d 243 (7th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 1563, 118 L.Ed.2d 210 (1992). This court finds no constitutional violations in the abovementioned CAB proceeding.

The petitioner's third and remaining challenge concerns a disciplinary hearing in case number RDC 92–09–0015. The petitioner was charged with violation of a state law, conspiracy to commit a felony. The Report of Conduct states that the petitioner conspired with two other individuals to damage the personal property of two or three correctional officers. In a separate Report of Investigation of Incident, the investigator referred to confidential statements from persons in and out of prison that suggested the conspiracy was to damage the officers' property, perhaps by fire-bombing their homes.

On September 17 and 18, 1992, the CAB proceeding was held on the abovementioned charges. Before the hearing, the petitioner wrote two letters detailing his objections to the hearing. The petitioner's defense "was that he was being 'set up' by officials at CIC, who perhaps had 'coaxed' [coerced?] the confidential informants, and by offenders who owed [the petitioner] money, some of them hundreds of dollars, for 'arts and crafts.'" *See Memorandum in Support of Return to Order to Show Cause.* Among the offenders the petitioner identified as being indebted to him were Marvin Stewart and Aaron Hall, two of the three inmates he had requested as witnesses in the drug case discussed above. *Id.* The hearing officer concluded:

Due to the preponderance of evidence being as follows: The reporting employee's report of investigation (confidential) along with report of conduct. Also different statements relating to the incident itself as received by transcript of taped interviews which were considered at this hearing.

Note: All confidential reports and transcript, if needed for review, will be forwarded to central office packet. This is for security reasons. Also considered was a statement made by Offender Wade, Travis after hearing of "The only way they could have confirmed I conspired with the two men was having taped that phone conversation. Isn't that right?" Therefore guilty as charged for a Class A–100 conspiracy to commit a felony.

*Id.* The hearing officer ordered three years' segregation, a one-step demotion in credit class, and loss of 300 days' earned credit time.

■ The petitioner challenges the impartiality of the hearing officer at the CAB proceeding. The petitioner contends that the hearing officer is biased because he was the hearing officer at the CAB proceeding involving the urine test. In addition, the petitioner maintains this contention is based upon a disagreement with the way the hearing officer determined the credibility of a confidential informant. The guarding judicial light on this subject, at least in this circuit, is found in *Redding v. Fairman,* 717 F.2d 1105 (7th Cir.1983), *cert. denied,* 465 U.S. 1025 [104 S.Ct. 1282, 79 L.Ed.2d 685] (1984). In *Underwood v. Chrans,* 1992 WL 211072, 1992 U.S.Dist. LEXIS 12616 (N.D.Ill. 1992), Judge Alesia discussed the impartiality of a prison disciplinary board:

> Courts have long held that prisoners are entitled to a hearing before impartial decisionmakers in a prison disciplinary proceeding. In *Merritt v. De Los Santos,* 721 F.2d 598, 601 (7th Cir.1983), the Seventh Circuit ruled that the impartiality requirement prohibits an official directly involved in the incident charged from serving on the adjustment committee. In *Redding v. Fairman,* 717 F.2d 1105 (7th Cir.1983), *cert. denied,* 465 U.S. 1025 [104 S.Ct. 1282, 79 L.Ed.2d 685] (1984), the court noted that "circumstances other than those arising directly out of the disciplinary process may raise such doubts about the integrity of the hearing procedure and the impartiality of its participants so as to trigger due process considerations." *Id.,* at 1113. The *Redding* court, however, reversed the

district court's ruling requiring disqualification of every committee member who was a defendant in a pending suit filed by the inmate appearing before the committee. On remand, the district court was directed to consider, among other things, "the extent of the Committee members' personal involvement in those suits." *Id.*

> In the instant case, defendant ... was not involved in the investigation of the incident charged nor was he a defendant in a pending suit filed by [the plaintiff] at the time he served on the Adjustment Committee.... An examination of the cases in this area in which courts have found either actual bias or sufficient evidence of bias to withstand summary judgment or dismissal on the pleadings reveals that courts will require either evidence that the decisionmaker has actually prejudged the case or direct personal involvement in the underlying charge. *See e.g. Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) (allegation that decisionmaker had "suppressed evidence, distorted testimony, and never informed [plaintiff] of the testimony against him"); *Malek v. Camp,* 822 F.2d 812, 816 (8th Cir.1987) (committee chairman was named defendant in pending lawsuit); *Giano v. Sullivan,* 709 F.Supp. 1209, 1216–17 (S.D.N.Y.1989) (investigating officer engaged in ex parte discussion with hearing officer); *Vines v. Howard,* 676 F.Supp. 608, 615 (E.D.Pa.1987) (decisionmaker's son was correctional officer who initiated the charge and testified at the hearing).

*Id.* This court finds no constitutional infraction here.

This court must also determine whether the confidential information examined passes muster under *Wells v. Israel,* 854 F.2d 995 (7th Cir.1988). The Attorney General has submitted with the "Return to Order to Show Cause" a sealed envelope marked "CONFIDENTIAL." The Attorney General explains that "[w]ithin that envelope are copies of the confidential documents to which the investigator and the hearing officer referred, and upon which the hearing officer relied in finding [the petitioner] guilty of the conspiracy." *See Memorandum in Support of Return to Order to Show Cause.*

In *Mendoza v. Miller* 779 F.2d 1287 (7th Cir.1985), the Seventh Circuit, speaking through Judge Coffey, cogently explained the importance of this process and the countervailing concerns of the process:

The government interest in institutional safety and an efficient disciplinary system are especially implicated when inculpatory information is provided by confidential informants because, "revealing the names of informants ... could lead to the death or serious injury of some or all of the informants." *McCollum v. Miller*, 695 F.2d 1044, 1048 (7th Cir.1982). Balanced against the government interest in protecting confidential informants and maintaining prison security is the prisoner's interest in a disciplinary hearing that is, "not so lacking in procedural safeguards that they create substantial doubt that these prisoners committed the offenses for which they were disciplined." *Jackson v. Carlson*, 707 F.2d 943, 948 (7th Cir.1983). To protect the inmate's interest in a fair hearing, our court requires some indication of the reliability of confidential informants when confidential information is the basis for a prison disciplinary decision. *Dawson v. Smith*, 719 F.2d 896, 899 (7th Cir.1983).

*Id.*

■ In the above captioned matter, the CAB made confidential documents a part of the record. In *Carter v. Duckworth*, 739 F.Supp. 1259 (N.D.Ind.1989), this court dealt with the issues surrounding the use of confidential information in a CAB proceeding. This court specifically invoked the analysis mandated in *Wells v. Israel, supra:*

The court must specifically examine the use of confidential information under the four alternatives established in *Wells v. Israel*, 854 F.2d 995, 998–999 (7th Cir. 1988). *Wells*, establishes four alternatives to prove confidential information is reliable in a C.A.B. hearing. These options are: (1) the oath of the investigating officer as to the truth of his report containing confidential information and his appearance before the Disciplinary Committee; (2) corroborating testimony; (3) a statement on the record by the chairman of the Disciplinary Committee that "he had first hand knowledge of the sources of the information and considered them reliable on the basis of their past record of reliability", or (4) in camera review of material documenting the investigator's assessment of the credibility of the confidential information. *See also Mendoza v. Miller*, 779 F.2d 1287, 1293 (7th Cir.1985), cert. denied, 476 U.S. 1142, 106 S.Ct. 2251, 90 L.Ed.2d 697 (1986).

*Id.* at 1261–62. This court has been provided with the aforementioned materials. Those materials have been reviewed and this court finds no constitutional violation in this CAB proceeding.

The petitioner also contends that "the disciplinary board's findings failed to meet evidentiary standards imposed by state law." *See Memorandum in Opposition to Respondent's Return to Order to Show Cause.* Specifically, the petitioner indicates that the CAB's findings on this issue fail to comport with the definition of the crime of conspiracy as outlined in Indiana Code 35–41–5–2. The petitioner's claim must be reviewed in light of the Supreme Court opinion in *Supt., Mass. Corr. Institution at Walpole v. Hill*, 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985). In *Hill*, the Court outlined and explained the requisite standards for evaluating CAB proceedings. In *Hill*, a prison guard discovered an inmate who had been assaulted and observed three inmates fleeing the area. All three inmates were found guilty of assault based on the prison guard's report of the event. Clearly, the prison disciplinary officials could fit the abovementioned facts into a plethora of scenarios. In resolving this quandary, the *Hill* Court explained:

The Federal Constitution does not require evidence that logically precludes any conclusion but the one reached by the disciplinary board. Instead, due process in this context requires only that there be some evidence to support the findings made by the disciplinary hearing. Although the evidence in this case might be characterized as meager, and there was no direct evidence identifying any one of the three inmates as the assailant, the record is not so devoid of evidence so that the findings

of the disciplinary board were without support or otherwise arbitrary.

*Id.* at 457, 105 S.Ct. at 2775.

In finding that the evidence adduced at the prison disciplinary hearing met the due process requirement, the Court concluded:

> We hold that the requirements of due process are satisfied if some evidence supports the decision by the prison disciplinary board to revoke good time credits. This standard is met if "there was some evidence from which the conclusion of the administrative tribunal could be deduced...." Ascertaining whether this standard is satisfied does not require the examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.

*Id.* at 455–56, 105 S.Ct. at 2774 (citations omitted).[1]

The CAB found that the petitioner was guilty of conspiracy. This court must review the result in light of *Hill.* In *Rights of Prisoners* by Professor Michael Mushlin, the author indicates that the "some evidence" standard of *Hill* has been interpreted in various ways. *See Michael Mushlin, Rights of Prisoners* at 512. "The Second Circuit has said that a reviewing court should not overturn a prison disciplinary board's finding of guilt if there is any evidence to support the board's conclusion." *Id.* "The Third Circuit has held that the proper standard for reviewing a disciplinary committee decision is the substantial evidence test, citing 18 U.S.C. § 4042 and 28 U.S.C. § 2255." *Id.* "The Seventh Circuit has stated that the role of a reviewing court is limited to determining whether there is sufficient evidence to support the disciplinary board's decision." *Id.*

In *Hamilton v. O'Leary, supra,* the Seventh Circuit explained the parameters of the proper review of CAB proceedings as mandated by *Hill.* The *Hamilton* court explained that the decision is based only on "'whether there is *any* evidence in the record that could support the conclusion reached by the disciplinary board.'" *Id.* (quoting *Hill, supra*). In addition, the *Hamilton* court indicated the requisite review "'does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of evidence.'" *Id.* (quoting *Hill, supra*). Finally, the *Hamilton* court added that "the evidence before the disciplinary board must 'point to the accused's guilt.'" *Id.* (quoting *Lenea v. Lane,* 882 F.2d 1171, 1175 (7th Cir.1989).

On this issue, the petitioner indicates that "[w]hen the basis for informant reliability findings and all details of the informant testimony are absent from the record, the factual basis for imposing discipline is missing, and perfectly arbitrary disciplinary action becomes a real possibility." *See Memorandum in Opposition to Respondent's Return to Order to Show Cause.* The petitioner's statement may be true, but the confidential information *is* a part of this record. In addition, the petitioner argues that in order to take disciplinary action on this charge, there must be proof beyond a reasonable doubt. Not true. This court has outlined the *Hill* opinion and the most recent Seventh Circuit opinion in *Hamilton.* The standard for a CAB proceeding is not proof beyond a reasonable doubt. In reviewing the CAB proceeding here, this court finds that the abovementioned CAB proceeding comports with constitutional due process.

The petitioner also maintains that he was denied effective assistance of counsel. In contrast, the Attorney General argues that the petitioner "asserts that he was incompetent to defend himself, that he did not want to request Offender Shelton to serve as lay advocate because the request would be denied and Shelton would be harassed, and that a different lay advocate had done him no good at the drug hearing in August." *See*

1. Recently, in *Lasley v. Godinez,* 833 F.Supp. 714 (N.D.Ill.1993) and *Harms v. Godinez,* 829 F.Supp. 259 (N.D.Ill.1993), Judges Aspen and Plunkett outlined the judicial parameters of the sufficient evidence concepts as elucidated in *Hill,* *supra.* Both Judges Aspen and Plunkett reviewed the recent Seventh Circuit opinion on this issue written by Judge Manion in *Hamilton v. O'Leary,* 976 F.2d 341 (7th Cir.), *reh'g denied,* (1992) (*en banc*).

*Memorandum in Opposition to Respondent's Return to Order to Show Cause.* In reviewing the paperwork pertaining to this CAB proceeding, this court notes that the petitioner did *not* request a lay advocate when given the opportunity and this fact is memorialized on the Report of Disciplinary Hearing. In *Miller v. Duckworth, supra,* the Seventh Circuit explained that this issue is based partially on the complexity of the CAB proceeding. This court finds the issue in this proceeding is not complex enough to mandate the use of a lay advocate. Most importantly, here, the petitioner was given the opportunity to have the assistance of a lay advocate, and declined. This court finds no due process violation on this issue.

■ The petitioner also challenges the procedure of a single officer rather than a three-member panel, and the Constitution of the United States does *not* require a panel for a CAB. In addition, the petitioner asserts a violation of certain state rules pertaining to CAB proceedings. Again, the claims are made purely with reference to the violation of state statutes, and the teaching of *Estelle v. McGuire,* 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), is applicable. This court finds no constitutional violations in the abovementioned CAB proceeding.

If this petitioner is attempting to make a claim for access to courts under *Bounds v. Smith,* 430 U.S. 817, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977), it would appear at least in this case that he has had an abundant access to this court in this case. It needs to be mentioned that this case is not brought under 42 U.S.C. § 1983, but rather under 28 U.S.C. § 2254. *See Allen v. Duckworth,* 6 F.3d 458 (7th Cir.1993). This court has the greatest respect for its obligation under *Bounds,* and even if the same is given full-blown application, there has been no violation of its basic tenets here.

The petitioner's Traverse filed on March 9, 1994, is quite lawyerlike, and presents the petitioner's argument in good form. It is a pleasure to examine such a document and the petitioner is to be complimented on its form.

The constitutional standards established in *Supt., Mass. Corr. Institution at Walpole v. Hill,* 472 U.S. 445, 105 S.Ct. 2768, 86 L.Ed.2d

356 (1985), and *Wolff v. McDonnell,* 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974) have been adhered to here. There is no basis here presented for relief under 28 U.S.C. § 2254. The petition for that relief is now DENIED. IT IS SO ORDERED.